Daniel W. SALLIS, Appellee, and Leslie Ann Sallis, Justin William Sallis, and Renee Marie Sallis, Minor Children, by Daniel W. Sallis, their Father and Next Friend, Plaintiffs,

v.

Helen LAMANSKY and the Sisters of Mercy of the Union in the United States of America, Province of Chicago, Appellants.

No. 86–1079.

Supreme Court of Iowa.

March 16, 1988.

Rehearing Denied April 8, 1988.

Raymond R. Stefani and Richard A. Stefani of Gray, Stefani & Mitvalsky, Cedar Rapids, for appellants.

James W. Hall and Thomas M. Gillespie of Hall & Irvine, Cedar Rapids, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, SCHULTZ, and LAVORATO, JJ.

SCHULTZ, Justice.

This appeal is from a $626,000 judgment entered in favor of plaintiff-appellee Daniel Sallis in a personal injury action. Sallis suffered a cervical hyperextension, commonly known as "whiplash," when his pickup was rear-ended by a vehicle driven by Helen Lamansky and owned by the Sisters of Mercy of the Union in the United States of America, Province of Chicago. This action was brought against Lamansky and the Sisters of Mercy by Sallis individually and on behalf of his children. The children were not awarded damages at trial and their claims for consortium are not involved in this appeal. The liability of the defendants was established at trial and is not disputed on appeal. We hold that the award of damages was excessive and reverse and remand for a new trial.

On June 4, 1982, plaintiff was driving his 1973 Dodge pickup in Iowa City behind two cars and a city bus and in front of a 1978 Plymouth Horizon driven by defendant Lamansky. The bus stopped, forcing the plaintiff to stop. At this time, defendant Lamansky's attention was diverted from the roadway and when she looked back she was unable to stop before striking the rear of plaintiff's truck.

In 1984, plaintiff commenced this negligence action against defendants for damages caused by this collision. He claimed to have suffered severe, permanent, and disabling injuries and asked to recover damages for pain and suffering, medical expenses, loss of income, and impairment of future earning capacity. Following trial, a jury found that defendant Lamansky was negligent and that plaintiff was damaged in the amount of $626,000. The trial court entered judgment on this verdict. The trial court overruled defendants' post-trial motions, but granted an uncontested application for a pro tanto credit of $1449.68 for payments plaintiff received prior to trial. The court of appeals affirmed the trial court and we granted defendants' application for further review.

On appeal, defendants claim that the trial court erred: (1) in excluding evidence of a computer analysis of plaintiff's psychological test results; (2) in permitting testimony of an economic expert concerning what plaintiff could have earned as an over-the-road truck driver; and (3) in failing to grant a new trial or a remittitur because the damages awarded plaintiff were excessive. We now turn to these issues.

■ I. *Evidence of computer analysis.* Defendants presented expert testimony of a psychologist who ultimately opined that plaintiff has a hysterical personality with hypochondriacal tendencies and tends to exaggerate pain. This opinion was based on his analysis of psychological tests of plaintiff. In an effort to support his diagnosis, the psychologist had also performed

a computer analysis of the test results to operate as a cross-check on his own impressions.

When the psychologist was asked on direct examination to state the results of the computer analysis, plaintiff objected on hearsay and foundational grounds. Over a standing objection, the witness was allowed to state, among other things: "Well, basically, the computer says that he exaggerates his symptoms and is faking that," and, "there is some exaggeration to his answers. That's what the computer is saying." The following day the trial court ordered testimony concerning the results of the computer analysis stricken from the record and instructed the jury to disregard it. Defendants maintain that this was an abuse of the trial court's discretion.

We have long been committed to a liberal rule which allows opinion testimony if it will aid the jury and is based on special training, experience, and knowledge with respect to the issue in question. *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 11 (Iowa 1977). The decision to admit or exclude opinion evidence rests within the trial court's own discretion and will not be disturbed on appeal absent manifest abuse of that discretion to the prejudice of the complaining party. *State v. Myers*, 382 N.W. 2d 91, 93 (Iowa 1986). We also allow expert witnesses to give opinions based on facts and data which are not admissible as evidence, if they are of a type customarily relied upon by experts in the particular field in forming opinions on the subject. Iowa R.Evid. 703; *see State v. Henze*, 356 N.W.2d 538, 540 (Iowa 1984) (records prepared by other professionals may provide basis for opinion testimony).

The expert witness was not precluded from using the computer analysis as a basis for his opinion. Rather, the excluded testimony involved the independent results of the computer analysis. There was insufficient evidence in the record to establish the reliability of the computer results. *See* Iowa R.Evid. 901(b)(9). We believe that this ruling was well within the trial court's discretion. *See Myers*, 382 N.W.2d at 93 (abuse of discretion occurs when the trial court's ruling is based on untenable grounds).

■ II. *Economist's testimony.* An economic expert testifying for the plaintiff provided an opinion on plaintiff's loss of future earning capacity. The defendants objected to the evidence on grounds that there was no proper factual foundation for the economist's opinion. The objections were overruled and the economist was permitted to testify concerning what plaintiff could have earned as an over-the-road truck driver from 1982 forward, but for the accident. The testimony was that plaintiff suffered a loss of earning capacity of between $671,068 and $941,943 depending on when he would retire. In addition to matters of present value, inflation and tax liability, this opinion was based on the assumptions, (1) that, but for the accident, plaintiff could have earned approximately $30,000 per year as an over-the-road truck driver from the time of the accident until retirement, and (2) that after the accident plaintiff was capable of earning only about $10,400 annually. Defendants contend that the record does not support these assumptions and that admission of this testimony was therefore improper.

There was much evidence in the record concerning plaintiff's work history and income. Over the seventeen-year period preceding the accident, plaintiff had worked for thirteen different employers as a farm laborer, factory worker, construction laborer, local truck driver and as an over-the-road driver. With one exception, plaintiff's wages in these jobs ranged from $3 per hour to $6.45 per hour. The exception was a job as an over-the-road truck driver that paid $600 to $700 per week or between $30,000–$35,000 per year. Plaintiff worked at this job for parts of both 1979 and 1980. Plaintiff's average annual income from 1977 up to the time of the accident was $10,489. Out of his seventeen years of employment experience plaintiff testified to less than three years as an over-the-road truck driver. He had not worked as an over-the-road truck driver for almost two years prior to the accident.

Plaintiff testified that he left his trucking job in 1980 to spend more time with his children after his wife died. He testified that he always planned to return to trucking and was ready to do so when the accident occurred. In fact, after the accident he obtained such a job but quit after one month because his injuries prevented him from doing the work. Plaintiff was allowed to testify that as an over-the-road truck driver he could have earned $30,000–$35,000 in 1982 (the year of the accident) and $35,000–$40,000 in 1986 (the year of the trial). At trial, a vocational rehabilitation expert testified that plaintiff was currently capable of earning about $11,000 annually, or about $17,000 annually if he received additional training.

While the economist testified that he considered plaintiff's work history, he admitted that his calculations did not consider time off for illness or vacation beyond what was reflected in the 1979–80 earnings and did not consider the possibility that plaintiff might be suspended for poor driving. Neither did he consider the effect of deregulation of the trucking industry after 1980.

Defendants maintain the testimony concerning plaintiff's loss of earning capacity was speculative and that the economist should not have been allowed to render an opinion under these foundational facts. Defendants argue that the economist was unfamiliar with the trucking industry, ignored plaintiff's poor driving record, focused on an isolated period of plaintiff's work history and failed to consider the fact that he had not worked as an over-the-road trucker for approximately two years prior to the accident. Plaintiff's response is that these matters go to the weight of the evidence and not its admissibility.

█ Loss of future earnings is a compensable item of damages in Iowa. *Hysell v. Iowa Pub. Serv. Co.,* 559 F.2d 468, 473 (8th Cir.1977). The measure of damages for loss of earning capacity is "the difference between the value of an individual's services, if working, as he would have been but for the injury, and the value of the services of an injured person, if working, in the future." *Anthes v. Anthes,* 258 Iowa 260, 270, 139 N.W.2d 201, 208 (1965). It is the loss of earning capacity that is compensable, not the loss of earnings. *Id.* Thus, damages are not measured by the difference in earnings received before and after the injury. *Holmquist v. Volkswagen of Am., Inc.,* 261 N.W.2d 516, 525 (Iowa App. 1977). "[T]he loss is to be measured by the impairment of general wage earning capacity, rather than loss of wages for a specific occupation...." *Hysell,* 559 F.2d at 473.

We believe that admission of the expert's opinion in this case was within the discretion of the trial court. The economist did not have to be familiar with the trucking industry as he was giving an opinion on projected income based on facts that were in the record. Defendants had the opportunity to present evidence concerning the trucking industry, plaintiff's driving record, and plaintiff's work history to discredit the economist's opinion. Plaintiff is correct that these factors go to the weight of the evidence and not its admissibility.

The trial court was faced with a difficult decision on whether to allow admission of this testimony. Plaintiff did not have a strong employment record and his ability to make $30,000 per year is disputable. However, the trial court ruled that a sufficient foundation had been laid to allow the economist ·to render an opinion projecting income on the basis of $30,000 per year. While the entire record shows that the ability to hold such a job is suspect, he did have the job for a certain period of time and it did yield a certain rate of pay. This economist's opinion was not based on speculation or conjecture. The question of whether plaintiff, but for his injuries, would have pursued this line of work and earned this level of income goes to the credibility of plaintiff's evidence rather than the admissibility. We cannot say that the trial court abused its discretion.

█ III. *Excessiveness of the verdict.* Defendants' final claim on appeal is that the $626,000 verdict is excessive. Although the trial court refused to disturb the verdict on defendants' motions, it expressed concern with the amount of the judgment. In overruling defendants' mo-

tion for judgment notwithstanding the verdict, the court stated that "there was barely sufficient evidence to support the injury and damage claims." In overruling the motion for new trial the court concluded that there was sufficient evidence to generate a jury question on liability and damages. It then stated, "There was not a sufficient showing to establish that the verdict was the result of passion and prejudice. Accordingly, a new trial cannot be directly granted on the grounds of excessive damages." In overruling the motion for remittitur it stated, "The Court will candidly admit that the verdict is high. Were this a case to the Court, this Court would not have approximated such a verdict in its award." It then went on to conclude that a court should only set aside a verdict for the most compelling reasons. The trial court reviewed the evidence and, in spite of its reservations, concluded that it was bound by the jury verdict.

Our case law shows that we have been loath to interfere with a jury verdict. In considering a contention that the verdict is excessive, the evidence must be viewed in the light most favorable to the plaintiff. *DeBurkarte v. Louvar*, 393 N.W.2d 131, 139 (Iowa 1986). Fixing the amount of damages is a function for the jury. The court should interfere only when the damage award is "flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support." *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 799 (Iowa 1984). We have stated that the most important of these reasons is whether there is support in the evidence. *Miller v. Young*, 168 N.W.2d 45, 53 (Iowa 1969) (quoting *Mazur v. Grantham*, 255 Iowa 1292, 1303, 125 N.W.2d 807, 813–14 (1964)). A verdict should not be set aside merely because the reviewing court would have reached a different conclusion, although the court "has inherent power to set aside a verdict which fails to do substantial justice between the parties." *Moore v. Bailey*, 163 N.W.2d 435, 436 (Iowa 1968). With these principles in mind, we now turn to the facts.

Plaintiff's injury is a cervical hyperextension, which is a soft tissue injury to the neck commonly known as "whiplash." The injury occurred when his three-quarter ton pickup truck was hit from the rear by a subcompact vehicle driven by defendant Lamansky. The speed of Lamansky's vehicle was disputed at trial, however, the evidence most favorable to the plaintiff showed that it was fifteen to twenty miles per hour when the collision occurred.

Following the accident, plaintiff drove himself to the emergency room at a local hospital. There he complained of neck pain, dizziness, and nausea. He was examined at the emergency room, x-rayed, and sent home. The x-rays revealed no skeletal abnormality. The medical records show that plaintiff's condition when he left was "satisfactory." The doctor prescribed a pain killer and muscle relaxant and told the plaintiff to rest and apply heat to any painful area. Plaintiff did not fill the prescription. Instead, he drove home, took some Tylenol and remained in bed for most of the weekend. The accident occurred on a Friday night and he returned to his job Monday morning.

A couple of weeks later plaintiff went to his family doctor and was referred to Dr. Dykstra, an orthopedic specialist. Over the next year and a half Dr. Dykstra saw plaintiff seven times and referred him to a physical therapist for ongoing treatment for pain. In January 1984, Dr. Dykstra referred him to a neurologist who examined him and ordered a myelogram which showed no cervical disc problems. Plaintiff has continued under the care of this neurologist and the physical therapist.

During his treatment, plaintiff was never hospitalized except for one night when he had the myelogram test. During this period of time he incurred medical and related expenses of almost $5,000.

Dr. Dykstra testified that plaintiff had seven and one half to ten percent permanent physical impairment because of injuries to his neck. Plaintiff's injuries were diagnosed by his treating physicians largely on the basis of plaintiff's complaints and descriptions of the pain. Although there

was little objective evidence, these doctors had no doubt about his injuries. Physicians testifying for the defendants indicated that their examinations of plaintiff revealed no objective indications of injuries or evidence of serious neurological disease to explain the symptoms which plaintiff had described. Thus, at best the evidence was divided concerning the extent and seriousness of plaintiff's injuries. Under our standard of review, we must conclude that plaintiff was entitled to some recovery for his injury.

In addition to his damage claims for medical expense and pain and suffering, plaintiff claims to have suffered a loss of earning capacity because of his injuries. Specifically, he testified that he could no longer work as an over-the-road truck driver and supported this contention with the testimony of his doctors. Evidence was presented that the economic loss from this disability ranged between $671,068 and $941,943. This evidence was discussed in Division II of this opinion.

In assessing damages the jury also had other evidence to consider relevant to plaintiff's claim for loss of earning capacity. Plaintiff's experience as an over-the-road truck driver comprised a small part of his work history. During the last ten months that plaintiff was so employed, he acquired five speeding violations, had four accidents which were determined by the company safety department to have been preventable by him, received four warning notices concerning hours of service violations and was given two two-week suspensions from driving by his employer in July and October of 1980 for hours of service violations. He was given notice that another similar or related offense could result in further disciplinary action, up to and including termination.

The evidence further shows that plaintiff continued to work as a dump truck operator after the accident for up to 60 hours per week without any indication to his supervisor or co-workers that he had suffered any injury or was incapable of doing the work. The evidence also showed that a year or so after the accident, plaintiff applied for an over-the-road trucking job. As part of the application process he had to undergo a physical examination. When asked if he had any head or spinal injuries or any permanent defects from injury, plaintiff answered "no."

Plaintiff's claim for loss of earning capacity by reason of his inability to drive a truck provided the only basis that the jury could have used to justify a $626,000 verdict. There was sufficient evidence in the record to allow expert economic testimony concerning the plaintiff's loss of future earning capacity. This would provide some evidentiary support for the jury's verdict. However, when we view the evidence in the record as a whole, we believe that the verdict is flagrantly excessive and fails to do substantial justice between the parties.

While plaintiff testified that he quit his over-the-road trucking job in 1980 because of his wife's death, he did so at a time when he was in trouble with his employer. He made no effort to acquire similar employment until 1983. Plaintiff's employment record showed thirteen jobs in seventeen years and average annual earnings in the $10,000–$11,000 range. There was little in the record to indicate that he would be willing to keep a trucking job even if he were to find one.

While there is a thread of evidence that supports the verdict, we believe the amount allowed is so excessive as to fail to administer substantial justice. *Ferris v. Riley*, 251 Iowa 400, 414, 101 N.W.2d 176, 184 (1960); *Von Tersch v. Ahrendsen*, 251 Iowa 115, 123, 99 N.W.2d 287, 292 (1959). We have considered and given appropriate deference to the trial court's decision not to grant a new trial. However, after reading the trial court's ruling, it is apparent that the court did not exercise its power to set aside a verdict that conflicts with substantial justice. We believe the trial court abused its discretion.

■ When, as here, a verdict is so flagrantly excessive that it goes beyond the limits of fair compensation for the injuries shown and fails to do substantial justice between the parties, it is our duty to correct the error by granting a new trial or

requiring a remittitur on pain of the grant of a new trial. *Ferris*, 251 Iowa at 414, 101 N.W.2d at 184. Although the defendants have requested remittitur, it is within our discretion to grant or deny that request. Iowa Rule of Civil Procedure 250 states that the court "may" impose such a condition on the grant of a new trial, however, we choose not to do so in this case. We reverse and remand for a new trial.

DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND REMANDED.